THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL HARMON, Defendant-Appellant.

First District (1st Division)   No. 1—86—2952

Opinion filed January 22, 1990.—Rehearing denied March 9, 1990.

Richard S. Kling, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, James Fitzgerald, and Charles E. Antonietti, Assistant State's Attorneys, and Michael Brychel, Law Student, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Following a jury trial, defendant, Carl Harmon, was found guilty of murder, battery and mob action and sentenced to 40 years' imprisonment.[1] In this appeal, the issues presented for review are: (1) whether the trial court erred in joining the offenses of mob action,

[1]Co-defendants Tyrone Patterson and David Thomas were tried for the same offenses in 1984. Those convictions were affirmed. See *People v. Patterson* (1986), 140 Ill. App. 3d 421, 488 N.E.2d 1283, *aff'd sub nom. People v. Thomas* (1987), 116 Ill. 2d 290, 507 N.E.2d 843, *aff'd* (1988), 487 U.S. 285, 101 L. Ed. 2d 261, 108 S. Ct. 2389.

battery and murder for trial; (2) whether defendant was proved guilty of murder beyond a reasonable doubt; and (3) whether the trial court erred in permitting the State to call certain witnesses against defendant in the presence of the jury when both the prosecution and defense knew that the witnesses would invoke the constitutional privilege against self-incrimination.

On August 20, 1983, the murder victim, James Kevin Jackson (Kevin Jackson), went to a party on Dodge Street in Evanston, Illinois, with a friend, in Jackson's foster mother's 1976 maroon Nova. Also at the party were defendant Carl Harmon, David Thomas, Tyrone Patterson and Juan McCune. Defendant, Thomas and Patterson were members of the Vice Lords, and McCune was a member of the Stony Hoods, a gang aligned with the Vice Lords. Jackson was allegedly a member of the Black Mobsters, a rival gang. A fight broke out at the party between the Black Mobsters and the Vice Lords.

Following the party, defendant, Thomas, Patterson and McCune walked toward the 1623 Club, a Black Mobster "hangout," located on Dewey and Simpson Streets in Evanston. Melvin Smith and Andre Brown, both members of the Black Mobsters, were on the sidewalk by the 1623 Club when they were jumped and beaten up by defendant, Thomas, Patterson and McCune. Defendant was identified by Thelma Clark, who witnessed the fight. After the attack on Smith and Brown, defendant and the three other men walked to Patterson's house, one block away from the 1623 Club, where McCune hid a knife under a brick in front of the house. They then went to Thomas' house on the east side of Dewey Street, where they sat in front of the house talking.

A four-door Nova drove by, stopped at the corner and backed up. Defendant went up to the car and saw the driver, Jackson, whom he knew to be a Black Mobster. Defendant and Patterson began hitting Jackson from the back seat, while Thomas and McCune began hitting Jackson from the driver's side. Jackson got out of the car on the passenger side, swung at Patterson and fell to the ground. According to McCune's testimony, defendant continued to kick Jackson in the head and side for approximately 10 to 15 minutes, repeatedly forcing Jackson's head against the curb. Defendant and Patterson then put Jackson in the back seat of the car. McCune got in the driver's seat, and Thomas rode in the front passenger seat. They drove to the dead end of Dewey Street, where they dragged Jackson out of the car to a puddle and pushed him in face first. While Jackson struggled for air, defendant allegedly said, "get up or die."

McCune then reportedly left in Jackson's car to retrieve his knife from Patterson's house. After retrieving the knife, he turned the cor-

ner at Dewey and Payne Streets, where Melvin Smith and another Black Mobster shot at the car. McCune then abandoned the car by some railroad tracks and went home.

Nancy and Laquita Adams, who lived at 2112 Dewey Street, testified that at about 3 a.m. on August 21, 1983, they were looking out the front window of their house. They saw a car parked outside and some men around the car. They also heard thumping and slapping noises and saw the men hitting something. After about five minutes, all of the men got into the car and drove toward the canal. They recognized one of the men as David Thomas. About 10 minutes later, a car pulled up by their driveway and a man got out, walked alongside of their house and then got back into the car. As the car travelled north on Dewey, Nancy heard some shots being fired.

After the car was found abandoned, it was processed by an evidence technician. The officer found a bullet hole in the rear window and a brownish-red stain on the back seat. Ten latent prints were also recovered from the car.

Officer Michael Gresham, a gang crimes investigator with the Evanston police department, was qualified as an expert on gangs. He testified that Jackson's body was positioned with the left leg crossed over the right leg with the hands extended over the head in a "V" shape, which he described as a Vice Lord "calling card." Officer Gresham stated that he had known defendant for six or seven years and believed him to be a member of the Vice Lords. Defendant had a top hat, cane and the initials V.L., which are Vice Lord symbols, tattooed on his right arm. On his left arm was tattooed the word "Mojack," which means "enforcer." On cross-examination, Officer Gresham admitted that he was not aware that Nancy and Laquita Adams had seen only three people by the car the night of the incident when he obtained four arrest warrants.

At trial, but outside of the presence of the jury, the State informed the court and opposing counsel of its intention to call Tyrone Patterson and David Thomas as witnesses. Defense counsel objected on the grounds that Patterson and Thomas both intended to invoke their fifth amendment right. Patterson had previously testified at his own trial but Thomas had not. The trial court thereafter permitted the State to call both men as witnesses in the jury's presence but told the jury that the State was precluded from calling the codefendants as witnesses. The trial court also informed defense counsel that they could make an objection that would be sustained. Following the denial of a motion for a directed verdict, the defendant presented his case.

Officer Mitchum of the Evanston police department testified that

Andre Brown first told him that he had been hit only by Tyrone Patterson, but after talking with Melvin Smith and Jeffrey Williams, Brown claimed that Patterson, Thomas, Harmon and McCune had hit him.

Brent Kutrow, a forensic scientist and latent prints examiner, testified that none of the fingerprints found on the car were Carl Harmon's. Officer William T. Neal, upon being recalled, testified that in his interview with Nancy Adams she told him that there were only three people in front of the house the night of the incident.

Officer Simmons testified that Laquita Adams told him that originally there were five or six people in front of the house, and 15 minutes later, when the car drove up, there were only three people in front of the Thomas house. He further testified that Laquita Adams stated that the three people approached the vehicle from the passenger side, and when they left, one person got in the driver's door and the other two got in on the passenger's side.

The defense also called Dawn Shulz, an attorney, who testified that she heard Melvin Smith tell Carl Harmon's attorney that he had been drinking the night of the incident and never saw who hit him. .

The jury returned verdicts of guilty for each count on the indictment and defendant was sentenced to 40 years for the murder of Kevin Jackson, 30 days for mob action against Andre Brown, 30 days for mob action against Melvin Smith, 364 days for the battery of Andre Brown and 364 days for the battery of Melvin Smith. Defendant now brings this appeal.

Defendant's first contention is that the joinder of the charges of battery and mob action with the charge of murder constitutes reversible error as it resulted in confusion of the issues and prejudice to defendant. He argues that there is no basis for finding that the gang fight at the party, which preceded the battery and mob action charges, was part of a common scheme including the murder of Kevin Jackson that would warrant joinder of the charges. We disagree.

■■ ■ The joinder of related prosecutions is governed by section 114—7 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 114—7), which provides that separate offenses may be joined if they are part of the same comprehensive transaction. The general test of the appropriateness of joinder is whether the offenses were of a similar nature or were part of a single transaction or common scheme. (*People v. Bean* (1978), 63 Ill. App. 3d 264, 279, 379 N.E.2d 732.) The most important factors to consider in deciding whether offenses are part of a comprehensive transaction are their proximity in time and location and whether there is common evidence

with respect to the offenses. (*People v. Reynolds* (1983), 116 Ill. App. 3d 328, 335, 451 N.E.2d 1003.) Whether to sever separate charges is a matter within the sound discretion of the trial court (*People v. Harris* (1986), 147 Ill. App. 3d 891, 894-95, 498 N.E.2d 621), and this court will not reverse that decision absent an abuse of discretion. *People v. Mikel* (1979), 73 Ill. App. 3d 21, 27, 391 N.E.2d 550.

In light of the record and our decision in the related case *People v. Patterson* (1986), 140 Ill. App. 3d 421, 488 N.E.2d 1283, *aff'd sub nom. People v. Thomas* (1987), 116 Ill. 2d 290, 507 N.E.2d 843, *aff'd* (1988), 487 U.S. 285, 101 L. Ed. 2d 261, 108 S. Ct. 2389, involving accomplices Tyrone Patterson and David Thomas, we decline to find that the trial court erred in refusing to sever the charges for trial. In *Patterson,* we noted that the murder had occurred "after an evening of violent gang-related incidents." (*Patterson,* 140 Ill. App. 3d at 423.) A review of the record substantiates that the charges here are sufficiently related in location, time, motive, design, method and common evidence to support the trial court's ruling in favor of joinder.

The mob action and battery occurred near the 1623 Club on Dewey and Simpson Streets in Evanston. The beating that culminated in the murder of Kevin Jackson was committed only a few blocks away at 2112 Dewey Street. Joinder is warranted where, as here, there is proximity in the location of the offenses. See, *e.g., In re Stokes* (1982), 108 Ill. App. 3d 637, 641, 439 N.E.2d 514; *People v. Daniels* (1976), 35 Ill. App. 3d 791, 798, 342 N.E.2d 809.

The crimes charged also were committed over a short period of time during the early morning hours of August 21, 1983. Defendant was alleged to have attacked Melvin Smith and Andre Brown at about 3 a.m. According to the testimony of witnesses Nancy and Laquita Adams, the beating of Kevin Jackson occurred shortly after 3 a.m. The occurrence of crimes within a close proximity in time supports the trial court's ruling in favor of joinder. See, *e.g., People v. Harris* (1986), 147 Ill. App. 3d 891, 894, 498 N.E.2d 621; *People v. Key* (1975), 28 Ill. App. 3d 637, 640, 328 N.E.2d 914.

The record also amply demonstrates that the mob action, battery and murder sprang from a common motive to attack members of a rival gang. The Vice Lords, with which defendant and his coparticipants were affiliated, were engaged in an ongoing battle against the Black Mobsters. Defendant, along with Patterson, Thomas and McCune, went to the 1623 Club looking for Black Mobsters to attack. After beating up Smith and Brown, they went to Thomas' house on Dewey Street, only a few blocks away. They let one person pass by on the sidewalk only after determining that the person was not a Black Mob-

ster. When Kevin Jackson stopped his car and was recognized as a member of the Black Mobsters, defendant and the others began to attack him. The thread of gang rivalry running through these incidents and culminating in the murder of Mr. Jackson clearly demonstrates a common design and adds further support to the trial court's decision to join the charges against defendant. In summary, there is no basis for finding that the trial court abused its discretion in joining the charges against defendant here.

■ There also is no merit to defendant's argument that the charges should not have been joined because the mob action and battery were committed against victims other than the murder victim. There is no requirement that the victims be the same, provided the other criteria for joinder have been satisfied. See, *e.g., People v. Reynolds* (1983), 116 Ill. App. 3d 328, 335, 451 N.E.2d 1003; *People v. Mikel* (1979), 73 Ill. App. 3d 21, 391 N.E.2d 550; *People v. Daniels* (1976), 35 Ill. App. 3d 791, 342 N.E.2d 809.

The second issue raised is whether defendant was proved guilty beyond a reasonable doubt. Defendant points to the fact that the only eyewitness to the murder who testified at trial was Juan McCune, an accomplice who had already pled guilty to concealing a homicide as part of a plea bargain, and whose testimony he contends was uncorroborated and contradicted. Defendant argues that neither the fingerprints found on the car nor the footwear impressions found near the canal were identified as his. He was not identified by the two occurrence witnesses, Nancy and Laquita Adams, and furthermore, at the 1984 trial of Patterson and Thomas, both Nancy and Laquita Adams had testified to seeing only three people hitting something on the ground. They also testified at the prior trial that they saw three people get into the car and drive toward the canal.

The State concedes that no witnesses other than McCune testified as to defendant's presence at the murder but contends that much of McCune's testimony was corroborated and that the minor inconsistencies in the State's case are not sufficient to create a reasonable doubt. The basis for this argument is that McCune's testimony as to events which preceded the murder was corroborated by the testimony of Jeff Williams, Melvin Smith, Andre Brown and Thelma Clark. The State does not address the absence of testimony, with the exception of that of McCune, regarding the identity or number of those present during the fatal beating of Kevin Jackson. Nor does the State address the repeated references of Nancy and Laquita Adams at the 1984 trial of defendants Patterson and Thomas to the fact that they saw three people doing the beating and three people driving away, which was contra-

dicted by testimony in the present trial that they were uncertain how many people were present.

The resolution of defendant's guilt or innocence, however, turns on the credibility of the witnesses and the weight given their testimony by the jury. (*People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267.) Where there is conflicting testimony, it is the jury's task to resolve the conflicts. (*Collins*, 106 Ill. 2d at 262.) The jury in the instant case was well advised of the credibility problems inherent in McCune's testimony. The jury was informed that McCune had lied under oath, that he had a substantial interest in avoiding incarceration in the same prison as Patterson and Thomas and that his testimony regarding the number of participants in the murder was at odds with the 1984 testimony of the Adamses.

■ The trial court also instructed the jury on the suspicion that attaches to accomplice testimony and related issues including prior inconsistent statements and prior convictions of a witness. The determinative question therefore, is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) Under these circumstances, we conclude that the jury could have found defendant guilty of murder beyond a reasonable doubt.

The final issue raised by defendant is that the trial court erred by permitting the State, in the presence of the jury, to call David Thomas and Tyrone Patterson as witnesses against defendant when both the State and defendant's counsel knew that both witnesses intended to invoke their fifth amendment privilege against self-incrimination. After the witnesses were called, the trial court announced that the State would be precluded from calling them as witnesses. In closing argument, the State referred to the preclusion by stating that you cannot "expect to have one Vice Lord testify against another." Defendant contends that this sequence of events and the State's commentary created a prejudicial inference that the witnesses had knowledge as to the guilt of defendant but refused to testify.

Defendant cites *People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297, in which the court held that a trial court did not err in refusing to allow a defendant to call his accomplice as a witness where it was apparent that the accomplice intended to invoke her fifth amendment privilege. The court in *Myers* focused on the fact that examination of such a witness adds little material evidence and serves only to prejudice the defendant in the eyes of the jury. (*Myers*, 35 Ill. 2d at 334.)

Citing *People v. Haran* (1963), 27 Ill. 2d 229, 188 N.E.2d 707, and *People v. Bennett* (1953), 413 Ill. 601, 110 N.E.2d 175, the court emphasized that it has "condemned the practice of calling a co-defendant as a witness where the witness refused to testify, *thereby compelling him to claim his privilege against self-incrimination.*" (Emphasis added.) (*Myers*, 35 Ill. 2d at 334.) We recognize that calling a witness to the stand with advance knowledge that the witness will invoke the fifth amendment may constitute error under Illinois law. (*People v. Crawford Distributing Co.* (1979), 78 Ill. 2d 70, 74, 397 N.E.2d 1362.) However, error occurs only where the State intentionally forces the witness himself to invoke the privilege with the result that an inference unfavorable to the accused is planted in the minds of the jurors. (*United States v. Foster* (7th Cir. 1973), 478 F.2d 1001, 1004.) Thus the case at bar is distinguishable.

■ While allowing the State to call defendant's accomplices and then stating that the State was precluded from calling them may have raised questions in the juror's minds, so doing does not run afoul of *Foster* or our supreme court's ruling in *Crawford*, in that the witnesses were not called to the stand and forced to invoke the privilege before the jury. No mention was made of the fact that the witnesses intended to invoke their privilege. The jury was informed only that those witnesses could not be called to testify. Moreover, in the instant case the jury already knew that both Patterson and Thomas had been tried and convicted for the same offense for which defendant was on trial. Under the rationale of *Namet v. United States* (1963), 373 U.S. 179, 10 L. Ed. 2d 278, 83 S. Ct. 1151, any error caused by allowing the State to call these witnesses is harmless in that there was sufficient other evidence at trial to provide the same inference. *Namet*, 373 U.S. at 189, 10 L. Ed. 2d at 285, 83 S. Ct. at 1156.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. Pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, and *People v. Agnew* (1985), 105 Ill. 2d 275, 473 N.E.2d 1319, the State is granted $75 in costs for defending this appeal.

Judgment affirmed.

BUCKLEY, P.J., concurs.

JUSTICE MANNING, dissenting:
I must respectfully dissent. I would reverse this case and remand for a new trial.

I believe the trial court erred by joining the offenses of mob action and battery with the murder charge and by allowing the State to call the codefendants as witnesses in the presence of the jury, notwithstanding that both parties and the court knew codefendants intended to invoke their constitutional privilege against self-incrimination.

While the decision to sever separate charges is a matter within the sound discretion of the trial court (*People v. Harris* (1986), 147 Ill. App. 3d 891, 894-95, 498 N.E.2d 551), within the instant factual matrix, it is my opinion that the court abused its discretion. This opinion is based on the weakness of the State's case combined with the prejudicial joinder of charges that had no common links. The statute provides, *inter alia*, that there may be a joinder of offenses in a single charge "in a separate count for each offense if the offenses charged *** are based on the same act or on two or more acts which are part of the same comprehensive transaction." Ill. Rev. Stat. 1985, ch. 38, par. 111—4(a).

The majority, in justification for its finding that the court did not abuse its discretion, cites to our previous decision in the related case of *People v. Patterson* (1986), 140 Ill. App. 3d 421, 488 N.E.2d 1283. The distinction in the facts of these two cases is the relevant consideration that should support an opposite conclusion as to defendant Carl Harmon.

While on the basis of the record there is no doubt that Patterson and Thomas were present both at the 1623 Club and at the scene of the murder, it is less clear that Carl Harmon was present at both locations. The victim of the battery initially was unaware that defendant participated in or was present at the battery and mob action, although other witnesses attested to his presence. The witnesses to the murder saw only three people, and three people had at the time of trial been convicted of the murder—Thomas, Patterson and McCune. McCune, an accomplice witness, was the only person to place defendant at the murder scene. McCune's testimony is strongly clouded by several factors. He admitted to being a perjurer; he was the recipient of a three-year sentence as opposed to, at a minimum, a 20-year sentence in exchange for his testimony; fingerprints secured from the car of the murder victim were not those of defendant, even though the accomplice witness testified that defendant went to the car and removed the key from the ignition; and most significantly, McCune had told his attorney that he was under the influence of alcohol and drugs when he gave his statement to the assistant State's Attorney.

In light of the facts as briefly outlined above, it is my view that joinder of the battery and mob action charges with the murder charge

was extremely prejudicial and constitutes reversible error. The clear purpose of utilizing the two misdemeanor charges was to demonstrate defendant's propensity to commit crimes. While such a joinder would be appropriate if it was to show common scheme, plan, design or *modus operandi* (*People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489), the gang fight occurring at the party and the murder of Kevin Jackson were not connected in any way. The murder victim was not at the scene of the battery. The two occurrences took place at different locations and at different times and between different people. While it is true that in both incidents gang members of two rival groups were involved, there is no clear cut link insofar as this defendant is concerned.

In light of the potential for confusion by the jury of the facts in each incident, it is my view that the court failed to balance the probative value of the evidence with the degree of prejudice that could result from the admission of other crimes evidence. See *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.

While several witnesses testified that Carl Harmon participated in the battery and was earlier in the company of Patterson, Thomas and McCune, and the jurors were well aware that Patterson and Thomas had been convicted of the murder, and McCune of concealing a murder, no inference should be permitted that because Carl committed the misdemeanors and was in the company earlier of Patterson and Thomas and McCune, he likewise committed the murder.

The testimony presented by the State regarding the batteries severely prejudiced defendant because the jury repeatedly heard defendant's name mentioned in association with men they knew had already been convicted of the victim's murder.

The defendant's argument that the probative value of the evidence is outweighed by the prejudice to the defendant and that evidence of separate offenses admitted in this trial would not have been admitted in separate trials is much more persuasive.

The defendant further contends that the court committed reversible error by allowing the State to call the defendant's two codefendants when they had earlier, out of the jury's presence, indicated they would invoke their privilege against self-incrimination. Our supreme court has steadfastly condemned the practice of calling a codefendant as a witness where the witness has indicated an intent to invoke his or her privilege against self-incrimination. *People v. Myers* (1966), 35 Ill. 2d 311, 334, 220 N.E.2d 297.

In *People v. Myers*, the defendant was convicted of murder and sentenced to death after a jury trial. On appeal, the defendant con-

tended that the trial court committed error by disallowing him to call his accomplice as a witness in surrebuttal. The court upheld the trial court's decision, reasoning that it was *apparent* to the trial court that the accomplice would invoke the privilege if she were called to the witness stand. The court viewed such a practice as being prejudicial to the defendant while adding little material evidence. *Myers*, 35 Ill. 2d at 334.

In the instant case, the record reveals that at the time of the trial in the case at bar, while the two codefendants had already been convicted, there was pending on behalf of each one a petition for leave to appeal. The record further reflects that the jury was thoroughly familiar through trial testimony, with the fact that the two codefendants had been convicted and that they both shared the same gang affiliation with the defendant. The trial court acknowledged that it would have been error to allow the witnesses to be called to the stand knowing that they intended to invoke their privilege. Notwithstanding that acknowledgement, the court permitted the State to call the witnesses in the presence of the jury, necessitating an objection by defense counsel which was sustained. The court offered no explanation to the jury after announcing that the State would be precluded from calling the witness.

The State argues that it is a sufficient safeguard from any adverse inference if the court precludes such witnesses from having to invoke the privilege in the jury's presence. I do not believe the cases cited by the State should so narrowly be construed. The State alternatively suggests that if it is error, it is harmless and cites to *Namet v. United States* (1963), 373 U.S. 179, 10 L. Ed. 2d 278, 83 S. Ct. 1151, which used the rationale that any inference is a mere replication of what the jury has already inferred. In *Namet v. United States* (373 U.S. at 189, 10 L. Ed. 2d at 285, 83 S. Ct. at 1156), the United States Supreme Court found that the effect of the witness' invocation of the fifth amendment privilege was minimized by the fact that other evidence adduced at trial provided the same inference. However, what the State fails to point out is that there was a dearth of evidence leading to such inferences in the instant case.

It is my view that any possibility that the jury, by virtue of the State's actions, could reach an adverse inference constitutes severe prejudice and is reversible error, especially when we consider that the evidence is not in any respects overwhelming and this is a close case at most. The manner in which the State conducted its case in this connection appears to me to have been a flagrant and conscious attempt to structure its case out of adverse inferences predicated on the use of

testimonial privilege. Since no explanation was given to the jury after they were called by the State and the court refused to allow them to take the stand, the jury could certainly have logically inferred that the witnesses were willing to testify for the State but that the court was preventing their testimony from being offered. Another logical inference is that the State would not call anyone as a witness who would testify adversely to its interests.

Accordingly, for the foregoing reasons, I would reverse the defendant's conviction and remand for a new trial.